THE PEOPLE OF THE STATE OF ILLINOIS *et al.*, Plaintiffs-Appellants,
v. TELEDYNE, INC., *et al.*, Defendants-Appellees.

Third District   No. 3—91—0499

Opinion filed August 31, 1992.

Roland W. Burris, Attorney General, of Springfield, and Marc Bernabei, State's Attorney, of Princeton (Rosalyn B. Kaplan, Solicitor General, and Rita M. Novak, Assistant Attorney General, of Chicago, of counsel), for appellants.

Latham & Watkins, of Chicago (Lawrence H. Levine and Cary R. Perlman, of counsel), and Linn C. Goldsmith, of Boyle, Goldsmith, Shore & Bolin, of Hennepin, for appellee US Ecology, Inc.

Robert M. Olian, of Sidley & Austin, of Chicago, for appellee Teledyne, Inc.

PRESIDING JUSTICE BARRY delivered the opinion of the court:

The People of the State of Illinois and the County of Bureau appeal from a summary judgment entered in the circuit court of Bureau County in favor of US Ecology, Inc., defendant, in an action to obtain an injunction ordering removal of certain hazardous wastes

from two disposal sites near Sheffield, Illinois. The trial court ruled that an administrative order of the United States Environmental Protection Agency (USEPA) directing US Ecology to contain and treat the waste contaminants in place conflicts with the remedy sought by plaintiffs and is, therefore, barred by the doctrine of Federal preemption under the supremacy clause of the United States Constitution (U.S. Const., art. VI). We affirm.

Named as defendants are US Ecology, owner of the sites in question, and its predecessor, Nuclear Engineering Company. US Ecology is a subsidiary of Teledyne Corporation, another defendant, which incorporated American Ecology Corporation, also named defendant, for the purpose of holding the shares of US Ecology and another subsidiary not here involved. US Ecology is the responding party defendant in this litigation.

The two hazardous waste disposal sites with which we are concerned were first used by defendants for the disposal of chemical wastes in 1967. One site, known as the "Old Site," consists of approximately 5.8 acres and has a total of six disposal trenches which were operated from 1967 to 1974. The second site, known as the "New Site," covers about 40 acres and has a total of 19 disposal trenches which were used from 1974 to 1983. Both sites received all necessary permits from the State of Illinois and strictly complied with all applicable Federal and State regulations and statutes. A third site, located south of the Old Site, is a low-level radioactive waste disposal site owned by the State of Illinois. The third site is not involved in this law suit.

Over a period of several years, hazardous chemical wastes have migrated from both the Old Site and the New Site. The principal release of chemicals is from the Old Site, which has contaminated a ground water plume extending over approximately 23 acres and affecting 24 million to 30 million gallons of groundwater. Among the chemicals identified as deposited at the Old Site are arsenic, selenium, pesticides, insecticides, arsanilic acid, curare, and phenol waste. The main plume from the New Site covers approximately one acre and may affect 300,000 to 500,000 gallons of groundwater. Additional smaller releases have also been detected south of trench 18EWC of the New Site and north of the New Site. The wastes at this site include benzene, pesticides, PCBs, pentachlorophenol, cyanide compounds, paint sludge containing lead and chromium pigments, waste phenol, and others.

The public has no access to the disposal sites and has not been exposed to contaminants, either by direct contact or through drink-

ing water. However, studies indicate that continued releases and migration could eventually reach sources of drinking water if not contained.

In 1982 when groundwater monitoring indicated migration of contaminants, appropriate reports were made to the Illinois Environmental Protection Agency (IEPA), which administers the regulation of hazardous waste in Illinois pursuant to the Federal Resource Conservation and Recovery Act (RCRA) (42 U.S.C. §6901 *et seq.* (1988)) and a delegation of authority from the USEPA. After study and negotiation, US Ecology agreed in 1985 to an administrative consent order issued by the USEPA pursuant to section 3008(h) of RCRA (42 U.S.C. §6928(h) (1988)), which requires an investigation of the Sheffield facility, a review of alternative remedies, and the selection and implementation of the most appropriate remedy to protect human health and the environment, all at the expense of US Ecology.

The field investigations were conducted by an independent consultant, Science Applications International Corporation (SAIC), pursuant to the requirements and direction of the USEPA, including more than 500 wells and borings. A draft remedial investigation report was prepared in 1987, and after another round of extensive testing, a final remedial investigation report was approved by USEPA in April of 1989. During 1989 feasibility study reports were submitted to USEPA evaluating alternative remedial technologies to restore the groundwater quality so as to eliminate any existing or potential risks to the environment or public health. Among the alternatives considered and rejected was the excavation of approximately 8,500,000 cubic feet of soil and waste materials for on-site incineration at the Old Site or for transportation to other locations.

The final Federal order was issued in October of 1990. The USEPA found that soil and waste removal would be dangerous, unnecessary, and impractical, and instead required US Ecology to develop contaminant source control and groundwater remediation by implementing specific corrective measures. Those measures include placement of slurry walls around certain trenches and repair of other existing trench barrier walls to contain further releases; placing an RCRA required cap on the Old Site and modifying the existing cap on the New Site to prevent surface water from percolating through trenches; placement of groundwater pumping wells in some locations to lower the level of groundwater below the level of contamination and in other locations to remove contaminated groundwater for treatment; and installation of additional groundwater

monitoring wells and implementation of a groundwater monitoring program. In addition, the USEPA directed US Ecology to comply with Illinois EPA regulations that ensure continuous oversight by Illinois agencies.

. The order required US Ecology to begin implementation within 30 business days of October 19, 1990. According to USEPA documents, it will take US Ecology 18 to 24 months to design and install components of the plan, and it will take 30 years for full implementation of the clean up measures.

Contemporaneously with the administrative activity of the USEPA, plaintiffs have pursued actions against defendants in the circuit court of Bureau County. In 1980 a complaint was filed by then Attorney General William J. Scott on behalf of the People of the State of Illinois alleging violations of certain statutes and creation of a public nuisance. The complaint sought an injunction to require US Ecology to stop accepting waste for disposal at the Sheffield facility and to exhume the wastes already deposited. Subsequently, the County of Bureau was granted leave to intervene. In 1983 US Ecology voluntarily ceased disposal of hazardous wastes at the Sheffield site.

In 1985 after the USEPA issued its consent order requiring investigation and study of remedial requirements and feasibility of alternatives, US Ecology sought dismissal of the complaint on grounds that the administrative order issued pursuant to Federal law preempted plaintiffs' action brought under Illinois statutory and nuisance law. The dismissal motion was denied because, in the absence of a Federal determination of appropriate remedial action, no direct conflict between Federal and State remedies had yet occurred. In 1987 plaintiffs were ordered, pursuant to defendants' discovery requests, to provide information supporting their claim that exhumation of the Sheffield disposal site was necessary, feasible and safe. When plaintiffs failed to respond, the action was dismissed for want of prosecution in March of 1988.

In July of 1988 plaintiffs filed the present action, again seeking an injunction to require defendants "to remove all chemical wastes deposited ·in the old and new chemical sites, together with any groundwater and soil already contaminated, and to treat such materials to render them harmless." Defendants responded with an answer setting forth 17 affirmative defenses, including Federal preemption.

Following the October 1990 USEPA report which rejected removal of the contaminated waste material and instead required con-

tainment in place, US Ecology filed a motion for summary judgment based on Federal preemption. After briefing and oral arguments, on June 6, 1991, the trial court found that an actual conflict existed between the remedies sought by plaintiffs and the remedial requirements imposed by USEPA. In announcing his decision, Judge Alexander Bower stated, "You can't keep this material buried and dig it up at the same time." Applying the doctrine of Federal preemption, the court held that the Federal administrative order must prevail. Judge Bower noted that the only evidence in this case was that developed by USEPA. Thus, plaintiffs were, in effect, asking the court to review the same studies and reports as were reviewed by the USEPA and to reach the opposite result. Summary judgment was granted, and plaintiffs' cause was dismissed.

The sole issue on appeal is whether the trial court correctly ruled that plaintiffs' action has been preempted by Federal law. The United States Supreme Court has clearly spelled out the doctrine of Federal preemption as follows:

> "[S]tate law can be pre-empted in either of two general ways. If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted. [Citations.] If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law [citation] or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress [citation]." *Silkwood v. Kerr-McGee Corp.* (1984), 464 U.S. 238, 248, 78 L. Ed. 2d 443, 452, 104 S. Ct. 615, 621.

The parties to this appeal agree that Congress has not intended to occupy exclusively the field of solid hazardous waste disposal. To the contrary, section 1002 of RCRA (42 U.S.C. §6901(a)(4) (1988)) recognizes that "the collection and disposal of solid wastes should continue to be primarily the function of the State, regional, and local agencies," while also acknowledging that the problems of waste disposal have become national in scope and "necessitate Federal action through financial and technical assistance and *** to provide for proper and economical solid waste disposal practices." Congress stated as one of its objectives in enacting the RCRA the establishment of "a cooperative effort among the Federal, State, and local governments and private enterprise in order to recover valuable materials and energy from solid waste." (42 U.S.C. §6902(11)

(1988).) From these statements, Congress made explicit its intention not to occupy the field of hazardous waste disposal.

If Federal preemption is applicable to this case, it is because of an actual conflict between the remedies ordered for the Sheffield site by the USEPA and the remedy sought by plaintiffs. In *Brown v. Kerr-McGee Chemical Corp.* (7th Cir. 1985), 767 F.2d 1234, the plaintiffs, who were adjacent property owners, brought an action requesting an injunction under State law to require removal of non-radioactive toxic wastes from a storage site owned by defendant. Because the nonradioactive materials were inseparable from radioactive materials at the site, the court ruled that Federal law under the Atomic Energy Act preempted plaintiffs' request for injunctive relief under Illinois law.

The applicable Federal law in *Brown v. Kerr-McGee Chemical Corp.* gave exclusive authority to the Nuclear Regulatory Commission (NRC) to regulate radiation hazards, and the NRC had received a staff recommendation that on-site encapsulation would be the best disposal alternative for the material in question. The court of appeals stated:

> "Although the Commission [NRC] has not yet decided which alternative to license, an injunction ordering Kerr-McGee to remove the byproduct material from the West Chicago site would, in effect, substitute the judgment of the district court for that of the NRC as to whether on-site encapsulation is the best method of storing this byproduct material. *** Such state law remedies *** interfere with the NRC's ability to choose the method of disposal that, in light of radiation, non-radiation, and economic considerations, is most appropriate. We therefore hold that plaintiffs' request for an injunction ordering the Kerr-McGee wastes moved elsewhere is preempted because, if granted, the injunction would stand 'as an obstacle to the accomplishment of the full purposes and objectives' of federal regulation of radiation hazards." 767 F.2d at 1242, quoting *Silkwood v. Kerr-McGee Corp.* (1984), 464 U.S. 238, 248, 78 L. Ed. 2d 443, 452, 107 S. Ct. 615, 621.

Also instructive is a recent decision in *United States v. Akzo Coatings of America, Inc.* (6th Cir. 1991), 949 F.2d 1409, where the USEPA entered a consent decree recommending a soil flushing process to remedy soil contamination at a 110-acre Michigan site that had been declared a toxic substance emergency by Michigan authorities. As provided by Federal statute, the consent decree was filed

in Federal court. Michigan intervened in the court proceeding and sought removal and incineration of the contaminated soil.

In the *Akzo* case, the USEPA acted under authority of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA) (42 U.S.C. §9601 *et seq.* (1988)), which expressly limited State involvement in clean up proceedings. The statutory provisions of CERCLA and SARA differ substantially from those of RCRA involved in the case at bar. However, of particular interest here is the court's analysis which distinguished between a preemption by Congressional action and preemption by the express terms of a consent decree which preempted alternative State remedies. The court noted that Michigan's only remedy under CERCLA was to claim that the consent decree did not incorporate more stringent State environmental standards. There it was held that Michigan's request for the alternative remedy of removal and incineration was properly dismissed upon a failure to show that the USEPA remedy would not achieve State standards.

Plaintiffs have cited *United States v. Akzo Coatings of America, Inc.* for the proposition that a consent decree does not have the force of Federal law until it has been filed in Federal court and, therefore, that a finding of actual conflict was premature in the case at bar. Plaintiffs ignore the fact that the procedure outlined in CERCLA requires such a filing and spells out in detail the State involvement in the process of dealing with major pollution sources. No such procedure is provided in RCRA.

Furthermore, in the case before us a State law injunction requiring removal of vast quantities of contaminated soil would be "an obstacle to the accomplishment of the full purposes and objectives" of Federal law embodied in RCRA and implemented by the USEPA in that it would severely restrict the remedial options available to the Federal agency as in *Brown v. Kerr-McGee Chemical Corp.* The same conclusion was reached in *Ensco, Inc. v. Dumas* (8th Cir. 1986), 807 F.2d 743, where a county ordinance prohibiting storage, treatment, or disposal of hazardous waste in county was held to be preempted by RCRA because of actual conflict with Federal law. Accordingly, we hold that plaintiffs' request for an injunction ordering removal of the hazardous wastes at the Sheffield site is preempted by the orders of the USEPA pursuant to RCRA.

Plaintiffs also claim that Congress intended to preserve traditional remedies under State statutes and common law by virtue of

an exemption in RCRA which provides: "Nothing in this section shall restrict any right which any person *** may have under any statute or common law to seek enforcement of any standard or requirement relating to the management of solid waste or hazardous waste ***." (42 U.S.C. §6972(f) (1988).) The section of RCRA to which this exemption refers is the "citizen suit" provision common to many Federal environmental enactments. (*International Paper Co. v. Ouellette* (1987), 479 U.S. 481, 93 L. Ed. 2d 883, 107 S. Ct. 805.) Plaintiffs here are governmental corporations, not private citizens, and, we conclude, have no preemption exemption under this clause.

Finally, plaintiffs argue that section 3009 of RCRA (42 U.S.C. §6929 (1988)) exempts their cause of action from Federal preemption. Section 3009 provides in part:

"Nothing in this chapter shall be construed to prohibit any State or political subdivision thereof from imposing any requirements, including those for site selection, which are more stringent than those imposed by such regulations." (42 U.S.C. §6929 (1988).)

Plaintiffs contend that a court order requiring the removal of hazardous waste in this case would be a more stringent requirement within the meaning of section 3009 than the USEPA requirement of containment and treatment in place.

In those cases where the savings clause provision of section 3009 has been considered, it has been construed to authorize local adoption of more stringent environmental standards than the USEPA but not to allow local governments to directly subvert RCRA and USEPA decisions by outright bans on activities Federal authorities considered safe. (*E.g., Ensco, Inc. v. Dumas* (8th Cir. 1986), 807 F.2d 743; *Ogden Environmental Services v. City of San Diego* (S.D. Cal. 1988), 687 F. Supp. 1436.) Here plaintiffs do not claim that the environmental standards which the USEPA is requiring US Ecology to attain are less stringent than Illinois standards. Instead, plaintiffs dispute the effectiveness of the remedies chosen by the USEPA to protect human health and the environment and disagree that removal and transportation of the wastes would be too dangerous.

We construe the savings clause in section 3009 as allowing local governments to establish more stringent *requirements, i.e.,* environmental standards, than Federal regulations. The savings clause does not allow local governments to demand different *remedies* than those ordered by the USEPA where there is no challenge to the en-

vironmental standards to be attained. We think it significant that the State of Illinois, via the Illinois EPA, has contributed valuable suggestions and comments in the remedy selection process and will have further opportunity to oversee the implementation of the remediation activities. Thus, the State will not be denied its appropriate role in protecting the health of its citizens. We hold that section 3009 does not exempt this cause of action from Federal preemption.

For the reasons stated, judgment of the circuit court of Bureau County is affirmed.

Affirmed.

McCUSKEY and GORMAN, JJ., concur.